United States District Court
Southern District of Ohio
Western Division

| | |
|---|---|
| Jorden Brown<br>c/o Laufman Napolitano, LLC<br>4310 Hunt Road<br>Cincinnati, Ohio 45242<br><br>          Plaintiff,<br>     v.<br><br>Samuel Giles<br>c/o Coal Grove Police Department<br>513 Carlton Davidson Ln.<br>Coal Grove, Ohio 45638<br><br>          and<br><br>Eric Spurlock<br>c/o Coal Grove Police Department<br>513 Carlton Davidson<br>Coal Grove, Ohio 45638<br><br>          *Individually and in his official*<br>          *capacity as Village of Coal*<br>          *Grove Chief of Police*<br><br>          and<br><br>Randall Scott Lewis<br>c/o Coal Grove Police Department<br>513 Carlton Davidson<br>Coal Grove, Ohio 45638<br><br>          *In his official capacity as*<br>          *Village of Coal Grove Chief of*<br>          *Police*<br><br>          and<br><br>Village of Coal Grove Chief of Police<br>c/o Coal Grove Police Department<br>513 Carlton Davidson<br>Coal Grove, Ohio 45638 | Case No. 1:21-cv-540<br><br><br>Complaint<br><br>(Jury Demand Endorsed Hereon) |

*In his official capacity as*
*Village of Coal Grove Chief of*
*Police*

and

Village of Coal Grove
513 Carlton Davidson
Coal Grove, Ohio 45638

          Defendants.

I. Preliminary Statement

1.      This civil rights case challenges as excessive force the use of a TASER to the head of Plaintiff Jorden Brown while he was running across pavement.  Mr. Brown was running when he was shot with the TASER and, predictably, he then slammed headfirst into the pavement without any ability to break his fall due to the neuromuscular incapacitation caused by the TASER's intended and well-known effect.  Mr. Brown was being questioned by Defendant Samuel Giles in regard to a warrant for an unpaid fine issued by a local mayor's court.  Mr. Brown was not suspected of any violence and at no time was Defendant Giles in fear for his safety.  Defendant Samuel Giles can be heard on video explaining why he chose to use the TASER, stating, "It was too hot to run."  When Mr. Brown was struck in the head by the TASER, he immediately began to have seizures while Defendant Giles continued to use the weapon on him.  Mr. Brown ultimately spent five days in a coma and suffered substantial neurological impairment as well as other physical injuries.  For years, Axon, the manufacturer of the TASER had issued product warnings indicating that the weapon would cause "serious injury or death… especially at risk are persons…who are running."  Axon had also issued product warnings admonishing that users avoid shooting people in the head with its electrical weapons designed to incapacitate.  Mr. Brown now

alleges violations of his civil rights under the Fourth and Fourteenth Amendments to the United

States Constitution pursuant to 42 U.S.C. § 1983.

## II. Jurisdiction and Venue

2.      This claim is brought pursuant to 42 U.S.C. § 1983.  This Court has jurisdiction to

hear this case pursuant to 28 U.S.C. §§ 1331, 1343 (3) and (4).

3.      Venue in the United States District Court for the Southern District of Ohio, Western

Division, is proper pursuant to 28 U.S.C. § 1391.

## III. Parties

4.      Plaintiff Jorden Brown ("Mr. Brown") is a citizen of the State of Ohio who, during

all relevant times, resided within the Southern District of Ohio.

5.      Samuel Giles ("Defendant Giles") was a Village of Coal Grove police officer on

duty on August 21, 2019.  He is sued in his individual capacity for actions he took under color of

state law.

6.      Eric Spurlock  ("Defendant Chief Spurlock") was, during all relevant times, the

duly empowered Chief of Police of the Village of Coal Grove Police Department, a unit of local

government organized under Ohio law.  Defendant Chief Spurlock was a policymaker for the

Village of Coal Grove and the Village of Coal Grove Police Department and he is sued in both his

individual and official capacities.

7.      Randall Scott Lewis ("Defendant Chief Lewis") is the duly empowered Chief of

Police of the Village of Coal Grove Police Department, a unit of local government organized under

Ohio law.  Defendant Chief Lewis is a policymaker for the Village of Coal Grove and the Village

of Coal Grove Police Department and he is sued in his official capacity as the Chief of Police.

8.      Village of Coal Grove Chief of Police ("Defendant Chief of Police") is the duly

empowered Chief of Police of the Village of Coal Grove Police Department, a unit of local

government organized under Ohio law.  Defendant Chief of Police is a policymaker for the Village of Coal Grove and the Village of Coal Grove Police Department and is a public officer sued in his or her official capacity and designated by official title rather than by name pursuant to Federal Rule of Civil Procedure 17(d).

9.      Village of Coal Grove, Ohio ("Defendant Coal Grove") is a unit of local government organized under Ohio law and located in Lawrence County, Ohio.  Defendant Coal Grove operates the Village of Coal Grove Police Department ("CGPD"), a police force empowered to arrest and detain individuals within its borders.

### IV. Facts

10.     Mr. Brown incorporates all preceding allegations as if fully restated herein, and further alleges as follows:

11.     Mr. Brown was a 24-year-old man on August 21, 2019.  Mr. Brown lived in Coal Grove, Ohio for many years.  Coal Grove is a small town in rural Southeast Ohio which had a population of less than 2000 people in that year.

12.     Mr. Brown was known in Coal Grove, having graduated from the local high school in 2013 in a class of approximately 70 students.

13.     By August 21, 2019, Mr. Brown had fallen on difficult times following the death of his father.  Mr. Brown's struggles involved poverty, addiction, and homelessness.

14.     On that fateful day, the anniversary of his father's suicide, Mr. Brown found himself destitute and desperate.  Mr. Brown went to his mother's place of employment, Giovanni's Pizza in Coal Grove, looking for financial assistance and a place to stay the night.

15.     Mr. Brown's mother knew of her son's struggles with addiction and sought assistance from the police knowing also that her son had a minor warrant for his arrest stemming from a non-violent misdemeanor conviction.

4

16.     On the date in question, Mr. Brown indeed had a bench warrant that had been issued by a local mayor's court for his failure to fully pay fines and court costs from minor, non-violent, offenses that occurred years prior.

17.     Defendant Giles responded to the request for assistance and approached Mr. Brown who was seated in the passenger seat of his mother's vehicle parked next to Giovanni's.[1]

18.     Defendant Giles was not investigating any active criminal activity as there was no crime afoot and he did not suspect that Mr. Brown was engaged in the commission of any crime.

19.     Defendant Giles had called ahead to dispatch prior to approaching Mr. Brown and learned that he had a "small warrant."  Defendant Giles was therefore only approaching Mr. Brown to discuss this "small warrant."[2]

20.     Defendant Giles approached the closed door of Mr. Brown's mother's vehicle to find Mr. Brown sitting quietly within.  This is captured on Defendant Giles's body worn camera video which continues to run throughout the encounter.[3]

21.     As Defendant Giles approaches, Mr. Brown opens the door and engages him in conversation advising Defendant Giles that his mother works in Giovanni's and that he may need a ride from her.

22.     Defendant Giles, who was fully aware that he was speaking with Jorden Brown, asked Mr. Brown whether he was aware of the warrant for his arrest.

---

[1] There are two video files comprising footage captured by Officer Giles's body worn camera on the day in question.  Copies of these have been placed on a thumb drive filed physically filed with the Clerk of Courts and are hereby incorporated into Plaintiff's Complaint and designated collectively as Exhibit "A."  The two files are designated as "Giles Body Cam 1 of 2" and "Giles Body Cam 2 of 2" on the thumb drive. Each video contains a date and time stamp in the bottom right-hand corner with the time indicated in the hh:mm:ss format using a 24-hour clock.  Specific points in the video are indicated by reference to this time marker.

[2] Giles Body Cam 2 of 2 at 19:33:19

[3] Giles Body Cam 1 of 2 at 19:00:35 through 19:07:32

23.     Mr. Brown told Defendant Giles that he did not think he had a warrant and provided him with a false surname, a name Defendant Giles knew to be false.

24.     Defendant Giles also knew that Mr. Brown did not have any history of violence, nor felony arrests, and that the "small warrant" outstanding from a non-violent misdemeanor conviction was his only issue at the time.

25.     At no time did Mr. Brown display a weapon or pose any threat toward Defendant Giles, or any other person.

26.     As he was speaking with Defendant Giles, Mr. Brown asked repeatedly whether he could speak with his mother who was just inside the restaurant.

27.     Defendant Giles refused to allow Mr. Brown to speak with his mother, or even to allow him to stand outside of the hot vehicle.

28.     After a few minutes of cordial discussion between the two men, Defendant Giles took a phone call on his personal cell phone.

29.     While Defendant Giles was on his phone, Mr. Brown exited his mother's vehicle, took time to shut the door, and then attempted to run away from Defendant Giles.

30.     Mr. Brown was wearing "slide" style shower sandals as he attempted to run away from Defendant Giles, across the pavement.

31.     Mr. Brown took approximately ten steps before Defendant Giles shot him from behind with his TASER.

32.     Defendant Giles took only the few steps necessary to allow him to draw, aim, and fire his weapon into Mr. Brown's head and back from behind.

33.     Defendant Giles admitted that this use of force against Mr. Brown was not a reasonable or necessary one.  Rather, Defendant Giles later told individuals on scene that he shot Mr. Brown with his TASER because, "Well… It's too hot to run." [4]

34.     Mr. Brown was running away from Defendant Giles and therefore was unable to see Defendant Giles raise the TASER and point it at him.

35.     Defendant Giles did not order or otherwise instruct Mr. Brown to stop running, or shout any other commands to him, before shooting him in the head from behind with the TASER.

36.     Defendant Giles did not issue any warnings to Mr. Brown of the intended use of the TASER, but immediately raised and shot the weapon at his head.

37.     There were no exigent circumstances that prevented Defendant Giles from either warning Mr. Brown of his imminent use of the TASER, or ordering him to stop, or otherwise instructing Mr. Brown before shooting him in the head with the TASER.

38.     Though he had only traveled a short distance, Mr. Brown had reached a full run on the pavement and had attained substantial forward momentum at the time Defendant Giles shot him in the head with the TASER.

39.     The X26 Model TASER used by Defendant Giles had two modes of operation: "probe mode" and "drive stun" mode.[5]

40.     When Defendant Giles shot Mr. Brown with the TASER, he did so in probe mode operation.  Probe mode utilizes compressed nitrogen to shoot two small probes connected by wires into the target's body and produces a shaped pulse energy burst that causes incapacitation and strong muscle contractions whereby the target's neuromuscular system is overcome.

---

[4] Giles Body Cam 2 of 2 at 19:35:37.

[5] The weapon used by Defendant Giles in this case is well known to courts in this Circuit.  For discussion of the weapon's history and capabilities see, e.g., *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 (6th Cir. 2012).

41.     The effect of a TASER's probe strike is that "[t]he electrical impulse instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body, rendering the target limp and helpless." [6]

42.     Axon, the TASER manufacturer, issued product warnings that the weapon could cause "serious injury or death… especially at risk are persons…who are running."

43.     Defendant Giles knew of the TASER's capabilities and dangers at the time he shot Mr. Brown with the weapon.

44.     The TASER caused its intended effect and immediately paralyzed Mr. Brown's body such that he slammed headfirst into the pavement without any ability to protect himself or break his fall in any manner.

45.     Defendant Giles was fully aware of this foreseeable harm resulting from his decision to shoot his TASER at Mr. Brown from behind and without warning while he was running across pavement.

46.     The TASER utilized by Defendant Giles was equipped with a laser sight which allowed a user to aim where the top of the two probes was to strike the target.  The second probe would then strike the target below the first probe to maximize the flow of electrical current through the target's body.

47.     Once the TASER was fired, the probes automatically delivered the electrical charge into the target's body for at least five seconds, unless the user affirmatively stopped the charge.

48.     Axon had issued product warnings indicating that users must avoid shooting subjects in various parts of the body, specifically, the head.

---

[6] *Id.*

49.     Defendant Giles was aware that deploying the TASER in probe mode to Mr. Brown's head could cause serious injury or even death.

50.     Defendant Giles was aware that deploying the TASER in probe mode to the head of a running target like Mr. Brown was likely to cause serious injury or even death.

51.     Defendant Giles, with full knowledge of all the foregoing, shot Mr. Brown in the head with the laser-aimed probe of his TASER, as depicted in the screen shot below (probe identified by blue arrow).[7]



52.     Defendant Giles knew that the probe had struck Mr. Brown in the head and did nothing to stop the TASER from continuing to deliver the electrical charge into his head for all five seconds.

---

[7] Giles Body Cam 1 of 2 at 19:06:24

53.     Mr. Brown struck the right side of his skull on the pavement when he fell.  A pool of blood immediately began to form around Mr. Brown's head as he laid on the pavement suffering convulsive seizures.

54.     Defendant Giles approached Mr. Brown's prone and convulsing body and immediately began deploying the TASER on him, in the weapon's drive stun mode.

55.     To operate the weapon in drive stun mode, Defendant Giles removed the probe cartridge and repeatedly drove the two electrode contacts on the end of the device directly into Mr. Brown's prone and convulsing body.

56.     Although Mr. Brown was subdued and had lost the ability to speak, move deliberately, or even to stop his body from seizing, Defendant Giles drive stunned him with the TASER multiple times.

57.     Defendant Giles forcibly handcuffed Mr. Brown, even though he was unresponsive, bleeding from the head, and in full muscle paralysis.

58.     Defendant Giles was aware that use of the TASER on Mr. Brown under these circumstances would only cause him excruciating pain and served no other lawful purpose since Mr. Brown was obviously subdued, severely injured, and completely vulnerable.

59.     Defendant Giles's repeated act of drive stunning the incapacitated Mr. Brown was a sadistic use of force that imposed excruciating pain.

60.     Defendant Giles's use of force on Mr. Brown violated clearly established law.

61.     Defendants Chief Spurlock and/or Chief Lewis and/or Chief of Police and/or Coal Grove (collectively "Coal Grove Defendants") did not have any written policies related to TASER use, deployment, safety, or training.

62.     The Coal Grove Defendants enacted policies and pursued customs related to TASERs which were reasonably foreseeable to result in the use of excessive force and cause serious injury.

63.     At the time of this use of force against Mr. Brown, the policy or custom of the Coal Grove Defendants authorized officers to shoot their TASERs, without warning or any opportunity to comply with commands, to stop persons running on pavement even though the persons were non-violent and only had warrants for minor offenses.  This policy or custom violated clearly established law which requires an officer to instead balance the government interest in Tasing such an individual against the potential harm to the individual, including the likelihood of serious injury or even death.

64.     At the time of this use of force against Mr. Brown, the policy or custom of the Coal Grove Defendants authorized officers to shoot individuals in the head with their TASERs, without warning or any opportunity to comply with commands, to stop persons running on pavement even though the persons were non-violent and only had warrants for minor offenses.  This policy or custom violated clearly established law which requires an officer to instead balance the government interest in Tasing such an individual against the potential harm to the individual, including the likelihood of serious injury or even death.

65.     At the time of this use of force against Mr. Brown, the policy or custom of the Coal Grove Defendants authorized officers to drive stun subdued and incapacitated individuals with their TASERs without warning or any opportunity to comply with commands.  This policy or custom violated clearly established law that prohibits prolonged Tasing of subdued individuals who are not resisting.

66.     At the time of this use of force against Mr. Brown, the Coal Grove Defendants failed to adequately train and supervise their officers in the use of TASERs.

11

67.     As a result, Defendant Giles was not adequately trained nor supervised in his use of a TASER.

68.     The Coal Grove Defendants failure to train and supervise their officers regarding the proper deployment of TASERs against non-violent persons with only minor warrants was a moving force behind the excessive force used on Mr. Brown by Defendant Giles in this case. These failures in training and supervision, both at the policy and individual levels, were deliberately indifferent to the safety needs of citizens that the CGPD were likely to encounter, such as Mr. Brown, who had a warrant for a non-violent, minor offense.

69.     The Coal Grove Defendants' policies or customs were enacted and pursued with full knowledge that the constitutional deprivation suffered by Mr. Brown was a foreseeable result.

70.     The Coal Grove Defendants policies or customs were a moving force behind the excessive force used on Mr. Brown by Defendant Giles. These policies or customs were therefore the proximate cause of the deprivation of Mr. Brown's rights to be free from excessive force and to Due Process of law.

71.     The Coal Grove Defendants failed to properly investigate Defendant Giles's use of force against Mr. Brown and failed to discipline Defendant Giles.

72.     In so doing, the Coal Grove Defendants ratified Defendant Giles's use of force and thereby incorrectly concluded that Defendant Giles had acted reasonably in his use of force against Mr. Brown.

73.     In ratifying the conduct of Defendant Giles, the Coal Grove Defendants acted consistently with their policies or customs with respect to TASER deployment and usage in violation of clearly established law.

74.     Defendant Spurlock personally enacted and/or implemented policies or customs which were unconstitutional and permitted the excessive use of force by TASER when no such

12

force was appropriate or necessary. These included, (a) the policy or custom of the Coal Grove Defendants authorizing the use of TASERs, without warning, to stop persons running on pavement even though the persons were non-violent and only had warrants for minor offenses; and/or (b) the policy or custom of the Coal Grove Defendants authorizing officers to shoot their TASERS, without warning, at the heads of non-violent, unarmed persons running on pavement from arrest for a minor offense; and/or (c) the policy or custom of the Coal Grove Defendants authorizing officers to drive stun subdued and incapacitated individuals with their TASERs without warning or any opportunity to comply with commands.

75. It was a foreseeable and natural consequence that the policies or customs enacted by Defendant Spurlock would cause officers of the CGPD to act pursuant to these unconstitutional policies or customs and subject Mr. Brown to the excessive force he suffered.

76. At all times relevant to this action, all Defendants acted recklessly, intentionally, with wanton and willful disregard, and with deliberate indifference toward the rights and safety of Mr. Brown. All Defendants acted, at all relevant times, under color of state law.

77. As a direct and proximate result of the Defendants' actions, Mr. Brown spent five days in a coma, suffered a broken collarbone, endured neurological impairment, and other physical and mental injury, pain, and suffering.

## V. Cause of Action- 42 U.S.C. § 1983

78. Mr. Brown incorporates all preceding allegations as if fully restated herein, and further alleges as follows:

79. All Defendants have, under color of state law, through their actions, ratifications, and/or policies or customs, subjected Mr. Brown to excessive force and failed to protect him from such force thus depriving him of rights, privileges, and immunities secured by the Fourth and Fourteenth Amendments to the United States Constitution.

80. All Defendants have, under color of state law, through their actions, ratifications, and/or policies or customs, denied Mr. Brown his rights to Due Process, including the privileges and immunities secured to him by the Fourth, and Fourteenth Amendments to the United States Constitution.

81. Mr. Brown suffered serious and lasting harm as a result of the actions of all Defendants including, without limitation, physical injury, pain, suffering, and emotional distress. Mr. Brown continues to suffer both physically and emotionally in the wake of these events.

82. All Defendants directly and proximately caused the injuries suffered by Mr. Brown and are therefore jointly and severally liable to him.

Prayer for Relief

WHEREFORE, Jorden Brown prays that this Court grant him judgment against the Defendants, jointly and severally, as follows:

1. Award him compensatory damages in an amount to be shown at trial;

2. Award him punitive damages against the individual defendants in an amount to be shown at trial;

3. Award him his reasonable attorney's fees and costs, and;

4. Grant to him such additional relief as the Court deems just and proper.

Respectfully submitted,

Paul M. Laufman (0066667)
Gregory A. Napolitano (0068671)
LAUFMAN NAPOLITANO, LLC
4310 Hunt Road
Cincinnati, OH 45242
(513) 621-4556
(513) 621-5563 Fax
plaufman@LN-lawfirm.com
gnapolitano@LN-lawfirm.com
*Counsel for Plaintiff, Jorden Brown*

<u>Jury Demand</u>

Plaintiff hereby demands a jury trial on all issues so triable.

Paul M. Laufman (0066667)